GORCEVICH v. ZURBRICK, District Director
of Immigration.
No. 5589.

Circuit Court of Appeals, Sixth Circuit.
April 7, 1931.

John G. Romanoff, of Detroit, Mich., for appellant.

Donald B. Frederick, of Detroit, Mich., (John R. Watkins, of Detroit, Mich., on the brief), for appellee.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

DENISON, Circuit Judge.

The alien, having most recently lived in Jugoslavia, and claiming to be a citizen thereof by its laws, sailed for Halifax, from some port not shown by the record. He arrived there March 8, 1927. He was ticketed through to Winnipeg, and the reasonable inference is that he went there. He had been a musician by occupation, and in June, 1927, he was playing in some place across the river from Detroit. From there he entered the United States. Accepting his own version as to the circumstances, his entry was unlawful for at least two reasons—lack of the quota visa on his passport and lack of inspection. Remaining in Detroit, he soon entered into relations with a woman of his nationality by birth, which relations he insists amounted to a valid common-law marriage. She was a naturalized citizen of the United States. February 14, 1928, he was taken upon a warrant of arrest charging that he was unlawfully in this country, because he had entered without inspection and without any proper visa. Following these proceedings, and on February 25, he and the woman citizen were formally married. On April 6, 1928, a warrant for deportation was issued, directing his return to Jugoslavia, the country whence he came. His application for writ of habeas corpus was dismissed, and he appeals.

■ In the recent case of Aurel Popa [Popa v. Zurbrick (C. C. A.) 45 F.(2d) 583], it appeared that Popa had the United States in his mind as his intended destination when he left his Roumanian home, and came, with some delay, through Canada to our border. It was therefore proper to send him back to Roumania. We find nothing in this record of corresponding effect. The alien's admission into Canada at Halifax was perfectly regular, and there is nothing to indicate that he intended to use that country as his "threshhold" for entering this. Apparently his domicile in Canada was clearly established. Under these circumstances, we think Canada was the country whence he came [U. S. v. Sisson (C. C. A. 2) 206 F. 450; U. S. v. Flynn (D. C. N. Y.) 22 F.(2d) 302]; and the deportation should have been to Canada. It is now well settled that, if a deportation warrant is erroneous in the name of the country to which the alien is to be deported, the warrant is unlawful, and detention under it is invalid. [Wenglinsky v. Zurbrick, 51 S. Ct. 35, 75 L. Ed. ——, Supreme Court, Oct. 13, 1930, reversing (C. C. A.) 38 F.(2d) 985]. Although in the Wenglinsky Case the Supreme Court directed absolute discharge, yet there were in that case special circumstances indicating that result; and we think in the ordinary case the Secretary of Labor should have opportunity to issue an amended warrant directing the appropriate deportation. Yee Suey v. Berkshire (C. C. A. 5) 232 F. 143.

■ It is suggested that Canada may refuse to receive him, and it is appropriate that, while the case is here, we should express our opinion on that contingency. The statute (section 156, title 8, USCA) says: "Or if such aliens are held by the country from which they entered the United States not to be subjects or citizens of such country, and such country refuses to permit their re-entry, or imposes any condition upon permitting re-entry, then [the deportation shall be] to the country of which such aliens are subjects or citizens." It is important to find in the somewhat confused sentence of which the clause just quoted is a part, the antecedent for "such aliens" and the definition of "the country from which they entered." The section at the outset provides, in a primary way, for deportation to "the country whence they came," and then provides alternatives for certain specific situations. The section must be interpreted as a whole; and we think that "such aliens," in the clause quoted, intends to refer, not to some particular classes of aliens which have been specifically provided for, but to the general class to which the section, as a whole, refers—that is, the aliens whose deportation is "provided for in this subchapter." In the same way, we think "country from which they entered the United States," in the clause under consideration, is a general term covering the different methods of entry, whether by land or water, and including embarkation for a direct voyage to the United States. It may or may not be the same as the "country whence they came"; if it is, the Secretary has no alternative choice, but there is no occasion for any; and it follows that, in this case, Canada is both the "country whence he came" and the "country whence he entered the United States." It further follows that, in case Canada should refuse to receive him, the deportation may be to the country of which he is a subject or citizen.

We note also that the warrant of depor-

1056

tation directs that this shall be at the expense of the steamship company which brought him to Canada. We know of no authority for this direction. If the deportation eventually is to Jugoslavia, it is not apparent that the company was in any way at fault, actually or constructively, and we find no applicable statute.

■ Another question requires attention: The appellant has presented and chiefly relied upon the claim that he belongs to a nondeportable class. His argument is based upon supposed analogy to the rule applied by Judge Brown, of the District Court of Rhode Island, in Dorto v. Clark, 300 F. 568. This was to the effect that, although the woman was plainly deportable under the general provisions of the Immigration Act, yet, by her marriage to an American citizen, she had become entitled, as of right, to a special and summary naturalization; that this right was inconsistent with deportability; and that she was therefore entitled to remain. Along the same line, it is said here that appellant, by becoming the husband of an American citizen, acquired a status inconsistent with his deportability. The specific claim is that, by the Act of May 26, 1924, § 9, and § 4(a), as amended by Act May 29, 1928, § 2 (title 8, USCA '§ 204(a), and title 8, § 209(b), appellant, not being otherwise inadmissible, became absolutely entitled to have a nonquota visa and to be admitted thereunder; that, while these provisions were doubtless intended mainly for nonresident spouses who had been married abroad, the case of a resident spouse, who wishes to go abroad and re-enter, is not excepted by the letter of the law or by its principle; that therefore appellant, on going back to Canada, would be entitled to re-enter, and that this formal method of exercising his rights might be availed of by appellant, except for the Act of March 4, 1929 (title 8, USCA § 180), which would forever bar his re-entry; and that, therefore, the true purpose of the law giving special rights to an alien spouse—to preserve established domestic relationships—can only be effected by considering him to be now nondeportable.

We have stated this position at length, in order that whatever force it has may be appreciated; but we are not convinced that the general purpose of the act as to alien spouses justifies interpreting it to cover the case of a man who was married in this country after his unlawful entry, and who was, at the time of his marriage, subject to deportation.

The order dismissing the writ of habeas corpus is reversed, and the case remanded for the entry of an order modified in accordance with this opinion, and for further appropriate proceedings.